IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

Charles H. Snyder and Deborah Snyder,      )
                                           )
                    Plaintiffs,            )      C.A. No. 8:21-1940-HMH
                                           )
            vs.                            )      **OPINION & ORDER**
                                           )
Auto-Owners Insurance Company;             )
Insurance Agency of the Foothills, LLC,    )
a/k/a Foothills Agency and Victor R.       )
Holley; Victor R. Holley, individually     )
and as an agent for Insurance Agency of    )
the Foothills, LLC, a/k/a Foothills and    )
Auto-Owners Insurance Company,             )
                                           )
                    Defendants.            )

This matter is before the court on Plaintiffs Charles H. Snyder and Deborah Snyder's

motion for partial summary judgment, Defendants Insurance Agency of the Foothills, LLC

a/k/a Foothills Agency and Victor R. Holley ("Holley"), individually and as an agent for

Insurance Agency of the Foothills, LLC, a/k/a Foothills Agency's (collectively "Foothills

Defendants") motion for summary judgment, and Auto-Owners Insurance Company's ("Auto-

Owners") motion for partial summary judgment.  After review, the court grants Auto-Owners'

motion for partial summary judgment, grants the Foothills Defendants' motion for summary

judgment, and denies Plaintiffs' motion for partial summary judgment.[1]

_____

[1] Pursuant to Local Rule of Civil Procedure 7.08, the district court may determine
motions without a hearing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of an insurance dispute regarding coverage for a dwelling under construction that was located at 314 Knollwood Drive, Salem, South Carolina ("the dwelling"). (Compl., generally, ECF No. 1-1.)  The dwelling was a total loss due to a fire that occurred on September 25, 2019.  At the time of the fire, the dwelling was 83% complete.  (Id. ¶¶ 35, 38, ECF No. 1-1.)

During construction of the dwelling, the Plaintiffs obtained an insurance policy for the dwelling from Auto-Owners.  The provisions of the Auto-Owners' insurance Policy number 52-133-376-01, with effective dates of January 18, 2019 through January 18, 2020, pertinent to these motions are set forth below.   (Auto-Owners' Mem. Supp. Summ. J. Ex. A (Policy), ECF No. 44-1.)

Under property and liability coverages it lists the following limits:

**PROPERTY AND LIABILITY COVERAGES**

A Dwelling $1,900,000
B Other Structures 190,000
C Personal Property 1,200,000
D Additional Living Expense and Loss of Rents 380,000
E Personal Liability (each occurrence) 300,000
F Medical Payments (each person) 1,000

(Id. Ex. A (Policy 10), ECF No. 44-1.)  In addition, the Policy provides in pertinent part:

**SECTION I - PROPERTY PROTECTION**

* * *

**6. b. HOW LOSSES ARE SETTLED**

Loss to covered property will be settled as follows:

* * *

2

(2)    If the damaged covered property is insured under Coverage A - Dwelling or Coverage B- Other Structures and not included in (1) above, **we** will pay as follows:

    (a)    If at the time of loss, the limit of insurance applying to the damaged covered property is 80% or more of the full replacement cost of that covered property, **we** will pay the full cost to repair or replace the damaged part of such covered property.  No deduction will be made for depreciation.  In no event shall **we** pay more than the smallest of:

    1)    the limit of insurance applying to the damaged covered property;

    2)    the cost to replace the damaged covered property with equivalent construction for equivalent use at the residence premises; or

    3)    the amount actually spent to repair or replace the damaged covered property . . . .

(<u>Id.</u> Ex. A (Policy 27), ECF No. 44-1.)  In addition, the Policy contains a Dwelling Under Construction Endorsement (the "DUC"), which provides in pertinent part as follows:

### 3.    LIMIT OF INSURANCE

The limits of insurance stated in the Declarations for Coverage A - Dwelling and Coverage B - Other Structures shall be the value upon completion and are provisional amounts.

The actual amount of insurance on any date shall be:

a.    the replacement cost of the damaged part of the building using like construction on the date of loss; or

b.    the necessary amount actually spent to repair or replace the damaged building on the date of loss.

(<u>Id.</u> Ex. A (Policy 38), ECF No. 44-1.)  In addition, in another amendatory endorsement, the Policy provides as follows:

Under **SECTION I - PROPERTY PROTECTION, CONDITIONS,** the following condition is added:

**VALUATION CLAUSE**

1.      If a total loss to the dwelling insured by Coverage A - Dwelling or other structures insured by Coverage B - Other Structures is caused by the peril of Fire or Lightning, then the limit of insurance stated in the Declarations for Coverage A - Dwelling or Coverage B - Other Structures, shall be taken conclusively to be the true amount of loss and measure of damages.

2.      If a partial loss to the dwelling insured by Coverage A - Dwelling or other structures insured by Coverage B - Other Structures, is caused by the peril of Fire or Lightning, then you shall be entitled to recover the actual amount of the loss, not to exceed the limit of insurance stated in the Declarations for Coverage A - Dwelling or Coverage B - Other Structures.

All other policy terms and conditions apply.

(Id. Ex. A (Policy 46), ECF No. 44-1.)[2]

The undisputed facts with respect to the purchase of the Policy are as follows.  In October 2018, the Plaintiffs contacted Holley, an insurance broker and owner of Insurance Agency of the Foothills, about obtaining an insurance policy to cover the construction of the dwelling.  (Foothills Mem. Supp. Summ. J. Ex. B (October 2, 2018 Email), ECF No. 43-2.)  The Plaintiffs had contracted with S.D. Hill Construction to build the home on July 6, 2018, for a contract price of $2,230,475.00.  (Pl. Mem. Supp. Summ. J. 2, ECF No. 42-1 ).[3]  Mr. Snyder had telephone and email communications with Holley regarding obtaining insurance coverage. Holley prepared three insurance proposals for a homeowner's policy with dwelling under

---

[2] Plaintiffs did not attach the entire Policy to their motion for summary judgment. However, Auto Owners attached a complete Policy to its motion for summary judgment. Plaintiffs did not dispute that the Policy attached to Auto Owners' motion for summary judgment is the Policy in question and it appears to have been produced by Plaintiffs during discovery.

[3] By January 2019, this contract price had increased to $2,306,814.00.  (Id. Ex. 6 (Email with Additional Charges), ECF No. 42-7.)  By October 2019, this contract price had increased to $2,455,536.71, due to allowance overages and costs. (Id. Ex. 6 (Email with Additional Charges), ECF No. 42-7.)

construction endorsements and emailed the proprosals to Mr. Snyder.  (Foothills Mem. Supp.

Summ. J. Ex. B (October 29, 2018 Email), ECF No. 43-2.)  The Plaintiffs did not accept any of

these three proposals.

On January 7, 2019, Mr. Snyder contacted Holley again about needing to obtain

insurance coverage for the dwelling under construction within 30 days.  (Id. Ex. F (January 7,

2019 Email), ECF No. 43-6.)  The following day, Holley provided an insurance proposal for

$1.5 million and explained in an email as follows:

> I have attached an updated quote proposal with an effective date at the end of this
> month.  I looked at several alternatives, but this appears to be your best option
> based on coverage and cost.
>
> Call me when you get this email & attachment so we can fine tune the coverage
> amount (I have adjusted the dwelling coverage to account for removing the land
> value from coverage but we still need to add details to a replacement cost estimator
> that I made multiple assumptions on).

(Pl. Mem. Supp. Summ. J. 3, Ex. 4 (January 8, 2019 Email), ECF No. 42-5.)

On January 13, 2019, Mr. Snyder responded to email writing as follows:

> In general this looks good to me but I'm thinking we should increase the coverage
> some.  My construction contract is for about $2.3 mm.  The foundation is about
> $400k.  So I'm thinking the coverage needs to be about $1.9mm vs. the $1.5 shown
> in the proposal.  Are you around on Tuesday?  I'll be in Phoenix but could give you
> a call.  Once we get this nailed down I will send you a check for the full premium.
> Starting coverage 1/31/19 is perfect.

(Id. Ex. 4 (January 13, 2019 Email), ECF No. 42-5.)  Two days later, Holley provided an

insurance proposal for the requested $1.9 million in coverage.  (Foothills Mem. Supp. Summ. J.

Ex G (January 15, 2019 Email), ECF No. 43-7.)  Mr. Snyder responded with some questions

about the proposal, including deductibles, Auto-Owners' history, builder's risk insurance, the

length of insurance, and questions about personal property coverage.  (Id. Ex. H (January 15,

5

2019 Email), ECF No. 43-8.)  Holley responded to Mr. Snyder's questions and provided a quote

for commercial lines builder's risk policy for comparison.  (Id. Exs. H & I (January 15, 2019

Email), ECF Nos. 43-8, 43-9.)  Holley emailed the Policy application, which he had prepared,

to Mr. Snyder for review and execution on January 18, 2019.  (Foothills Mem. Supp. Summ. J.

Ex. K (January 18, 2019 Email), ECF No. 43-11.)  On the application, under the section titled

"Coverage Endorsement Options - Property," the box for "Guaranteed Home Replacement

Cost" was not checked.  (Id. Ex. J (Policy Application), ECF No. 43-10.)  That same day, Mr.

Snyder electronically signed the Auto-Owners' policy application for $1.9 million in coverage

and the Policy was issued.  (Pl. Mem. Opp'n Foothills' Mot. Summ. J. Ex. 6 (Mr. Snyder Dep.

5-6), ECF No. 48-6); (Foothills Mem. Supp. Summ. J. Exs. J & K (Application and January 18,

2019 Email), ECF Nos. 43-10, 43-11.)

    Auto-Owners has paid Plaintiffs a total of $2,182,818.14 under the Policy for the fire

loss, consisting of $1.9 million for Coverage A, $154,000 for Coverage B (other structures),

$35,850 for Coverage C (personal property), $49,913.74 for Coverage D (additional living

expenses for HOA dues, accrued interest on construction loan, and the cost of funding new

construction loan), and $43,054.40 for Additional Coverages (tree removal and debris removal).

(Auto-Owners Mem. Supp. Summ. J. 3 & Ex. B (Snyder Supp. Discovery Resp. 7), ECF Nos.

44 & 44-2.)

    Plaintiffs filed the instant action on May 27, 2021, in the Court of Common Pleas for

Oconee County, South Carolina.  (Compl., ECF No. 1-1.)  Auto-Owners removed the action to

this court on June 28, 2021, on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  In the

complaint, as to Auto-Owners, Plaintiffs allege a declaratory judgment act claim seeking a

declaration that Auto-Owners is required to pay the actual cost of replacing the home under the

Policy, and affirmative claims for breach of contract, bad faith, negligent misrepresentation,

equitable estoppel, and unfair methods and deceptive practices in violation of S.C. Code Ann.

§ 38-57-30 et seq, of the South Carolina Insurance Trade Practices Act.  In addition, Plaintiffs

allege a negligent misrepresentation claim and equitable estoppel claim against the Foothill

Defendants.

The parties filed their respective motions for summary judgment on June 17, 2022.

(Pl. Mot. Summ. J, ECF No. 42); (Foothills Mot. Summ. J, ECF No. 43); (Auto-Owners' Mot.

Summ. J, ECF No. 44.)  Responses in opposition were filed on July 13, 2022.  (Pls. Resp. Opp'n

Auto-Owners Mot. Summ. J, ECF No. 47.); (Pls. Resp. Foothills Mot. Summ. J, ECF No. 48.);

(Auto-Owners Resp. Opp'n Pls. Mot. Summ. J., ECF No. 49.)  The Foothills Defendants filed a

reply on July 20, 2022.  (Foothills Reply, ECF No. 50.)  This matter is now ripe for

consideration.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  In deciding whether a genuine issue of material fact exists, the evidence of the

non-moving party is to be believed and all justifiable inferences must be drawn in his favor.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Monahan v. County of Chesterfield, 95 F.3d 1263, 1265 (4th Cir. 1996).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Ballenger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).

**B. Auto-Owners and Plaintiffs' Cross Motions for Summary Judgment**

Both Plaintiffs and Auto-Owners move for partial summary judgment requesting that the court interpret the Policy as a matter of law.  Specifically, Auto-Owners alleges that it

> is entitled to summary judgment on the Snyders' coverage claims and a declaration that: (1) the dwelling limit, as stated in the Declarations page, is the maximum amount owed on a covered loss to a dwelling under construction; (2) Auto-Owners is not required to pay the Snyders any sums over and above the dwelling limit; and (3) Auto-Owners is not required to pay the Snyders for any additional living expense that was not incurred by the Snyders.  In the alternative, Auto-Owners respectfully requests that the court declare recovery under the Dwelling Under Construction endorsement is limited to replacement cost on the date of the loss.

(Auto-Owners Mem. Supp. Summ. J. 2, ECF No. 44.)  The Plaintiffs moved for summary judgment requesting a declaration that Auto-Owners is responsible for the replacement cost or amount actually spent to repair the dwelling and in the alternative, "if the limit and amount of

insurance under the D.U.C. is ambiguous, the limit of insurance should be construed at a minimum as the value upon completion." (Pls. Mem. Supp. Summ. J. 10, ECF No. 42.)

"Insurance policies are subject to general rules of contract construction." State Farm Mut. Auto Ins. Co. v. Calcutt, 530 S.E.2d 896, 897 (S.C. Ct. App. 2000) (citations omitted.), overruled on other grounds by Sweester v. S.C. Dep't of Ins. Reserve Fund, 703 S.E.2d 509 (S.C. 2010). Courts must "give policy language its plain, ordinary and popular meaning." Id. "When the contract is unambiguous, clear, and explicit, it must be construed according to the terms used by the parties." Myers v. Nat'l Sales Ins. Co., 606 S.E.2d 486, 488 (S.C. Ct. App. 2004) (citation omitted). "The judicial function of a court of law is to enforce an insurance contract as made by the parties, and not to rewrite or to distort, under the guise of judicial construction, contracts, the terms of which are plain and unambiguous." Stewart v. State Farm Mut. Auto Ins. Co., 533 S.E.2d 597, 601 (S.C. Ct. App. 2000) (citation omitted). "Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." Poston v. Nat. Fidelity Life Ins. Co., 399 S.E.2d 770, 772 (S.C. 1990) (internal quotation marks and citation omitted).

> All of the policy provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity. The meaning of a particular word or phrase is not determined by considering the word or phrase by itself, but by reading the policy as a whole and considering the context and subject matter of the insurance contract.

Stewart, 533 S.E.2d at 601 (internal quotation marks and citation omitted).

## 1. Insurance Limits for Dwelling Under Construction

The Policy states that the coverage limit for a dwelling is $1.9 million dollars.  Further, the Policy provides that

> If at the time of loss, the limit of insurance applying to the damaged covered property is 80% or more of the full replacement cost of that covered property, **we** will pay the full cost to repair or replace the damaged part of such covered property.  No deduction will be made for depreciation. **In no event shall we pay more than the smallest of:**
>
> 1)   **the limit of insurance applying to the damaged covered property**;
> 2)   the cost to replace the damaged covered property with equivalent construction for equivalent use at the residence premises; or
> 3)   the amount actually spent to repair or replace the damaged covered property. . .

(Auto-Owners Mem. Supp. Summ. J. Ex. A (Policy 27), ECF No. 44-1) (emphasis added)

Because the dwelling was under construction, the Policy included a DUC endorsement that states that for a dwelling under construction "[t]he limits of insurance stated in the Declarations for Coverage A - Dwelling and Coverage B - Other Structures shall be the **value upon completion** and are **provisional** amounts."  (Id. Ex. A (Policy 38), ECF No. 44-1) (emphasis added).  The DUC endorsement further provides that

> [t]he actual amount of insurance on any date shall be:
>
> a.   the replacement cost of the damaged part of the building using like construction on the date of loss; or
> b.   the necessary amount actually spent to repair or replace the damaged building on the date of loss.

(Id. Ex. A (Policy 38), ECF No. 44-1.)

However, the valuation endorsement in the Policy plainly provides that in the event of a total loss due to fire "the limit of insurance stated in the Declarations for Coverage A - Dwelling

10

or Coverage B - Other Structures, shall be taken conclusively to be the true amount of loss and measure of damages." (Id. Ex. A (Policy 46), ECF No. 44-1.)

The issue in this case is whether the language in the DUC endorsement operates to increase coverage beyond the stated limit in the policy of $1.9 million for the dwelling. Plaintiffs argue that the DUC unambiguously requires that the limit of insurance is the value upon completion irrespective of the stated limit in the Policy and Valuation clause. The Policy "must be read as a whole, and the court will not read [the DUC endorsement] in isolation." Stewart, 533 S.E.2d at 601.

The plain, unambiguous language of the Policy limits Coverage A - Dwelling to $1.9 million. There is nothing in the DUC endorsement that alters this conclusion. The valuation endorsement unambiguously provides that in the event of total loss due to fire the limit of insurance stated in Coverage A "shall be taken conclusively to be the true amount of loss and measure of damages." Therefore, the value upon completion in the DUC endorsement is conclusively the limit of insurance stated in Coverage A for a total loss due to a fire. The use of the term provisional, when taken as a whole with the entirety of the Policy, unambiguously dictates that the amount of insurance for a loss before construction is completed can be less than $1.9 million, but cannot exceed $1.9 million. To find otherwise would render an absurd result. The Plaintiffs contracted for an insurance limit in the amount of $1.9 million and paid the premium based on that amount.

Further, the South Carolina Supreme Court held in Averill v. Preferred Mutual Insurance Co., 441 S.E.2d 632, 633 (S.C. 1994), that S.C. Code  Ann. § 38-75-20, "require[s] that in a

11

case of total loss by fire, recovery equals the full amount of insurance under the policy and not the actual value of the insured property." S.C. Code Ann. § 38-75-20 provides:

> No insurer doing business in this State may issue a fire insurance policy for more than the value stated in the policy or the value of the property to be insured. The amount of insurance must be fixed by the insurer and insured at or before the time of issuing the policy. In case of total loss by fire the insured is entitled to recover the full amount of insurance. In case of a partial loss by fire the insured is entitled to recover the actual amount of the loss but in no event more than the amount of the insurance stated in the contract .

In <u>Averill</u>, the court was considering a DUC endorsement which provided that "[t]he limit of liability stated in the declarations for Coverage A is provisional. The actual amount of insurance on any date while the policy is in force will be a percentage of the provisional amount. The percentage will be the proportion that the actual value of the property bears to the value at the date of completion." 441 S.E.2d at 632. Further, the court considered the valuation clause in the policy which stated, "[w]ith respect to the perils of fire and lightning, we agree that the limit of liability stated in Coverage A and B of the Declarations of this policy is the value of the building described. This valuation is established for insurance purposes only." <u>Id.</u> at 633. The court held that "[t]here [was] nothing in the policy itself to support the conclusion that the definition in [the valuation clause] d[id] not apply." <u>Id.</u>

Likewise, in the case at bar, there is nothing in the Policy to support the conclusion that the valuation stated in the valuation endorsement does not apply. Based on the foregoing, the Coverage A dwelling limit of $1.9 million stated in the declarations is the maximum amount owed on a covered loss to a dwelling under construction that is a total loss due to fire.

### 2. Additional Living Expense and Loss of Rents

In addition, Auto-Owners seeks a declaration that it is "not required to pay the Snyders for any additional living expense that was not incurred by the Snyders." (Auto-Owners Mem. Supp. Summ. J. 2, ECF No. 44.)  Under Coverage D - Additional Living Expense and Loss of Rents, the Policy provides a limit of $380,000.  (Id. Ex. A (Policy 10), ECF No. 44-1.)  Further, the Policy states that

> d. Coverage D - Additional Living Expense And Loss Of Rents
>
> If a covered loss makes your residence premises unfit to live in, we will pay, at your option, either:
>
> (1)    the reasonable increase in your living expenses necessary to maintain your normal standard of living while you live elsewhere;
>
>         or
>
> (2)    the fair rental value of that part of the residence premises where you reside, less any charges and expenses which do not continue while the residence premises is unfit to live in.
>
> We will pay for only the shortest time required to repair or replace the residence premises or for you to permanently relocate.  We will also pay for your loss of normal rents resulting from a covered loss while the rented part of the residence premises is unfit to live in, less charges and expenses which do not continue during that time.  We will pay this loss of normal rents only for the shortest time needed to make the rented part fit to live in.

(Id. Ex. A (Policy 20), ECF No. 44-1.)  Further, the DUC endorsement provides that Additional Living Expense and Loss of Rents coverage extends to the location identified in the Policy declarations under "Temporary Residence Premises Coverage," in this case, the Plaintiffs's residence in Charlotte, North Carolina.  (Id. Ex. A (Policy 37), ECF No. 44-1.)  Further, the DUC endorsement provides that "[t]his coverage extension includes additional living expenses incurred by **you** as a result of covered loss to the dwelling under construction caused by a peril

**we** insure against, if the damage prevents you from occupying the dwelling on the scheduled date." (Id. Ex. A (Policy 37), ECF No. 44-1.)

Under the Policy, the Plaintiffs are not entitled to any additional living expenses that they have not incurred. Plaintiffs concede in their response that they have not incurred any rental expenses. (Pls. Resp. Opp'n Auto-Owners Mot. Summ. J. 19, ECF No. 47.) However, the Plaintiffs allege that they have incurred "costs for their Charlotte residence that they would not have incurred if they had already moved into the Home," including costs for "property taxes for their Charlotte residence, HOA fees for their Charlotte residence, assessments on their Charlotte property[,] and more." (Id., ECF No. 47.)

To date, Auto-Owners has paid the Plaintiffs $49,913.74 under Coverage D for "incurred HOA dues as well as accrued interest on the original construction loan and the cost of funding a new construction loan." (Auto-Owners Mem. Supp. Summ. J. 4, ECF No. 44.) Auto-Owners requests that the court declare "that the Policy does not provide[ ] coverage for expenses not actually incurred by the insureds as a result of the fire loss." (Id. at 12, ECF No. 44.) The court agrees that the Policy does not provide coverage for expenses that have not actually been incurred by the Plaintiffs. .

As the Plaintiffs concede, they have not incurred any rental expenses and, therefore, are not entitled to any rent reimbursement. (Pls. Mem. Opp'n Auto-Owners Mot. Summ. J. 19, ECF No. 47.) With respect to HOA dues for the Charlotte residence, this is not an additional living expense because Auto-Owners has reimbursed the Plaintiffs for HOA dues associated with the covered dwelling. (Auto-Owners Mem. Supp. Summ. J. Ex. 2 (Pls. Resp. Interrogatory No. 7),

ECF No. 44-2.)  Therefore, the Plaintiffs have not incurred any additional or duplicate HOA dues.

However, the question remains whether the Plaintiffs have incurred any additional living expenses.  The Plaintiffs allege that they have incurred additional expenses for property taxes and assessments on the Charlotte residence and "more."  (Pls. Mem. Opp'n Auto-Owners Mot. Summ. J. 19, ECF No. 47.)  The Plaintiffs assert that "[t]hese costs have been provided to Auto-Owners and still have not been paid to the Plaintiffs."  (Id. 19, ECF No. 47.)

On the record before the court, there is a question of fact as to whether other additional living expenses have been incurred by the Plaintiffs.  With respect to taxes on the Charlotte home, this could be an additional living expense that the Plaintiffs would otherwise not be required to pay had it not been for the covered loss if, in fact, the Plaintiffs have been paying duplicate property taxes  two properties as opposed to one  beyond the time period contemplated for construction.  (Id. Ex. 11 (Mr. Snyder Dep. 3), ECF No. 47-11 ("I'm paying property taxes for two properties, one in Charlotte and one . . . at the lake . . . I would not be paying two property taxes had the house not burned down . . . I pay assessments and dues in both locations. I would not be paying assessments and dues in two locations had the house not burned down.") The court is unclear what "assessments on their Charlotte property and more" references with respect to incurred additional living expenses.  Plaintiffs have provided no specific information regarding these alleged additional living expenses.

Based on the foregoing, to the extent Auto-Owners has moved for summary judgment seeking a declaration that the Plaintiffs are not entitled to any additional living expenses that they have not incurred, the motion is granted.  However, there remains a factual dispute with

respect to whether the Plaintiffs have incurred additional living expenses with respect to duplicate property taxes and assessments.

### C.  The Foothills Defendants' Motion for Summary Judgment

The Foothills Defendants move for summary judgment on Plaintiffs' claims for negligent misrepresentation and equitable estoppel.

Under South Carolina law, the elements of a claim for negligent misrepresentation are:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

deBondt v. Carlton Motorcars, Inc., 536 S.E.2d 399, 405 (S.C. Ct. App. 2000) (citation omitted).  A negligent misrepresentation claim cannot be based on "unfulfilled promises or statements as to future events."  Tom Hughes Marine, Inc. v. Am. Honda Motor Co., 219 F.3d 321, 324-25 (4th Cir. 2000) (quoting Woodward v. Todd, 240 S.E.2d 641, 643 (S.C. 1978).  An exception to this general rule "exists only when a person makes a promise having at the time no intention of keeping [the] agreement."  Id. at 325 (internal quotation marks omitted).  Claims for negligent misrepresentation are commonly alleged against insurers based on misrepresentations by agents or employees.  Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 292, 299 (S.C. 1996) (finding insurer liable for negligent misrepresentations by employee); Kelly v. S.C. Farm Bureau Mut. Ins. Co., 450 S.E.2d 59, 62 (S.C. Ct. App. 1994).  However,

> [t]here is no liability for casual statements, representations as to matters of law, or matters which plaintiff could ascertain on his own in the exercise of due diligence. [W]hile issues of reliance are ordinarily resolved by the finder of fact, 'there can be no reasonable reliance on a misstatement if the plaintiff knows the truth of the

matter.  Thus, if the undisputed evidence clearly shows the party asserting reliance
has knowledge of the truth of the matter, there is no genuine issue of material fact.
A determination of justifiable reliance involves the evaluation of the totality of the
circumstances, which includes the positions and relations of the parties.

Quail Hill, LLC v. County of Richland, 692 S.E.2d 499, 508 (S.C. 2010) (internal citations and

quotation marks omitted).

The Foothills Defendants contend that (1) there was no false representation, (2) no

evidence that Plaintiffs actually relied on any false representation, and (3) even if Plaintiffs had

relied on any false representation, any reliance is unreasonable as a matter of law.   (Foothills

Defs. Mem. Supp. Summ. J., generally, ECF No. 43.)  Plaintiffs allege that they thought they

were purchasing a replacement cost policy.  Mr. Snyder testified that he indicated to Holley that

he "want[ed] to be fully protected in case of a calamity."  (Pls. Mem. Opp'n Foothills Mot. Sum.

J. Ex. 6 (Snyder Dep. 23, 27), ECF No. 48-6 ("[W]hen I sent him a check, I believed that I was

fully protected in the case of a full-on calamity so that I could rebuild my house.").)  Mr. Snyder

testified that every time he spoke with Holley about coverage, Holley "ran it back through his

replacement cost calculator; and in that context, I believe that I was covered by both the Auto-

Owners homeowners policy and the Auto-Owners dwelling under construction endorsement."

(Pls. Mem. Opp'n Foothills Mot. Sum. J. Ex. 6 (Snyder Dep. 22), ECF No. 48-6.)

The undisputed facts belie Plaintiffs' arguments.  There is no evidence that Holley ever

told Mr. Snyder that he was obtaining a replacement cost policy, and there is no evidence that

the Plaintiffs requested a replacement cost policy.  To the contrary, Mr. Snyder testified that he

could not recall if he requested a replacement cost policy.  (Pls. Mem. Opp'n Foothills Mot.

Sum. J. Ex. 6(Snyder Dep. 26-27), ECF No. 48-6.) ("Did you ever specifically request a

replacement cost policy from Vic? A. I-I can't remember that I requested or didn't request a, quote, replacement cost policy.")

Plaintiffs' argument in support of the negligent misrepresentation claim is devoid of any evidence that Holley made any false representations regarding the coverage afforded under the Policy. Plaintiffs allege that Holley's email proposing that the $1.5 million proposal was the "best option on coverage and cost" was a false representation. (Pls. Mem. Opp'n Foothills Mot. Summ. J. 11-12, ECF No. 48.) However, this vague language is not evidence of a false representation. As the Fourth Circuit noted in <u>Lewis v. Trustmark Insurance Co.</u>,

> [s]tatements of a vague and general character cannot be read to make representations of a specific character. Otherwise, claims such as [plaintiff's] would render actionable a host of general positive statements about product quality. The terms "full" and "comprehensive" are vague, general terms that cannot be construed to make specific representations about the coverage of a particular form of experimental treatment.

No. 98 2493, 1999 WL 486665, at *5 (4th Cir. July 12, 1999) (per curiam) (unpublished) (affirming grant of summary judgment on fraudulent inducement claim where plaintiff argued that her employer informed her that "if she became an employee of CSI, she would be provided full and comprehensive coverage for medical treatment for her breast cancer") . "An insurer's vague puffery that a policy provides the 'best and broadest' available coverage does not constitute a factual misrepresentation." <u>CRC Scrap Metal Recycling, LLC v. Hartford Cas. Ins. Co.</u>, 531 F. App'x 333, 335 (4th Cir. 2013); <u>Miller v. PremierCorp.</u>, 608 F.2d 973, 981 (4th Cir. 1979) ("[A]n unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud."). "Moreover, the failure to advise is not a representation, much less a false representation." <u>CRC Scrap Metal Recycling, LLC v. Hartford Cas. Ins. Co.</u>, No. CA

7:12-146-HMH, 2012 WL 4903661, at *11 (D.S.C. Oct. 15, 2012), aff'd, 531 F. App'x 333 (4th Cir. 2013).

In addition, the Plaintiffs' reference Holley's use of a replacement cost calculator in developing a coverage amount for the dwelling. Mr. Snyder testified that the use of the replacement cost calculator led him to believe that the Policy was a replacement cost policy. (Foothills Mem. Supp. Summ. J. Ex. M ( Mr. Snyder Dep. 15), ECF No. 43-13.)

Holley provided an insurance proposal for $1.5 million and explained in a January 8, 2019 email that included the quote as an attachment as follows:

> I have attached an updated quote proposal with an effective date at the end of this month. I looked at several alternatives, but this appears to be your best option based on coverage and cost.
>
> Call me when you get this email & attachment so we can fine tune the coverage amounts (I have adjusted the dwelling coverage to account for removing the land value from coverage but we still need to add details to a replacement cost estimator that I made multiple assumptions on).

(Pls. Mem. Supp. Summ. J. 3 & Ex. 4 (January 8, 2019 Email), ECF No. 42-5.)

Notably, Mr. Snyder responded to email writing as follows:

> In general this looks good to me but I'm thinking we should increase the coverage some. My construction contract is for about $2.3 mm. The foundation is about $400k. So I'm thinking the coverage needs to be about $1.9mm vs. the $1.5 shown in the proposal. Are you around on Tuesday? I'll be in Phoenix but could give you a call. Once we get this nailed down I will send you a check for the full premium. Starting coverage 1/31/19 is perfect.

(Id. Ex. 4 ((January 13, 2019 Email), ECF No. 42-5.) Holley responded to Mr. Snyder's email with a revised quote of $1.9 million, which was attached for Mr. Snyder's review. (Foothills Mem. Supp. Summ. J. Ex. G (January 15, 2019 Email), ECF No. 43-7.)

It is plain from the email that Plaintiffs were contemplating a coverage amount less than the original contract price of $2,230,475.00 for the construction of the dwelling, which would be without question less than the replacement cost of the dwelling. Moreover, Holley's reference to utilizing a replacement cost calculator to help determine a fixed insurance coverage amount is not a false representation that the actual policy would be a replacement cost policy. To the contrary, Holley indicates that he made assumptions in utilizing a replacement cost calculator in evaluating a proposed definitive coverage amount of $1.5 million. Mr. Snyder requested a higher definitive coverage amount of $1.9 million based on what he thought the coverage needed to be. (Id. Ex. 4 ((January 13, 2019 Email), ECF No. 42-5.) The Policy was not issued for the $1.5 million dollar amount, but the $1.9 million requested by the Plaintiffs. Based on the foregoing, there is no evidence that Holley falsely represented to the Plaintiffs that he was obtaining a replacement cost policy for the dwelling.

Moreover, even if Holley made a false representation, there is no evidence that Plaintiffs' reliance was reasonable. "[W]hile issues of reliance are ordinarily resolved by the finder of fact, there can be no reasonable reliance on a misstatement if the plaintiff knows the truth of the matter. Thus, if the undisputed evidence clearly shows the party asserting reliance has knowledge of the truth of the matter, there is no genuine issue of material fact." McLaughlin v. Williams, 665 S.E.2d 667, 671 (S.C. Ct. App. 2008) (internal citations omitted). Mr. Snyder knew that the Policy coverage amount was less than the replacement cost for the dwelling. If Mr. Snyder believed he was getting a replacement cost policy, he would have had no concerns with the $1.5 million coverage amount. (Pls. Mem. Supp. Summ. J. Ex. 4 (January 13, 2019 Email), ECF No. 42-5.) Instead, Mr. Snyder stated that he believed that the $1.5 million was too

20

low and that the coverage amount should be higher at $1.9 million.   (Id. Ex. 4 ((January 13, 2019 Email), ECF No. 42-5.)   Moreover, the Plaintiffs' position that they believed that they were getting a replacement cost policy because Holley utilized a replacement cost calculator is further undercut by Mr. Snyder's testimony that he did not understand the meaning of a replacement cost calculator.  (Foothills Mem. Supp. Summ. J. Ex. M (Mr. Snyder Depo. Tr. 5-6, ECF No. 43-13) (Mr. Snyder did not understand the meaning of the term replacement cost estimator because he "had never heard the term before").

Furthermore, Mr. Snyder executed the Policy Application, which did not have the box for "Guaranteed Home Replacement Cost" checked, which reflects that through the exercise of basic due diligence, Mr. Snyder would have known from the application alone that there was no guaranteed home replacement cost provided with the Policy.  (Id. Ex. J (Policy Application), ECF No. 43-10.)   "There is no liability [for negligent misrepresentation] for . . . . matters which plaintiff could ascertain on his own in the exercise of due diligence."  Quail Hill, 692 S.E.2d at 508 (internal quotation marks omitted).  Based on the foregoing, the Foothills Defendants are entitled to summary judgment on the Plaintiffs' negligent misrepresentation claim.

In addition, the Foothills Defendants move for summary judgment on the Plaintiffs' equitable estoppel claim.

> Typically, equitable estoppel is found to exist when the following elements are present:  (1) [C]onduct by the party estopped which amounts to a false representation . . . which is calculated to convey the impression that the facts are otherwise than and inconsistent with those which the party subsequently attempts to assert; (2) the intention or at least expectation that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the true facts; (4) lack of knowledge or the means of knowledge of the facts by the other party; (5) reliance upon the conduct by the other party; and (6) a detrimental change of position by the other party because of his reliance.

<u>McCrowey v. Zoning Bd. of Adjustment of City of Rock Hill</u>, 599 S.E.2d 617, 619 (S.C. Ct. App. 2004). For the same reasons as stated above, the Foothills Defendants are entitled to summary judgment on the Plaintiffs' equitable estoppel claim.

It is therefore

     **ORDERED** that the Plaintiffs' motion for partial summary judgment, docket number 42, is denied. It is further

     **ORDERED** that Auto-Owners' motion for partial summary judgment, docket number 44, is granted. It is further

     **ORDERED** that the Foothills Defendants' motion for summary judgment, docket number 43, is granted.

     **IT IS SO ORDERED.**


                                  s/ Henry M. Herlong, Jr.
                                  Senior United States District Judge

Greenville, South Carolina
August 1, 2022