IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| Charles H. Snyder and Deborah Snyder, ) | |
| ) | C.A. No.  8:21-01940-HMH |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **OPINION & ORDER** |
| ) | |
| Auto-Owners Insurance Company; ) | |
| Insurance Agency of the Foothills, LLC, ) | |
| a/k/a Foothills Agency; ) | |
| and Victor R. Holley, individually ) | |
| and as an agent for Insurance Agency of ) | |
| the Foothills, LLC, a/k/a Foothills Agency ) | |
| and Auto-Owners Insurance Company, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on Defendant Auto-Owners Insurance Company's ("Auto-Owners") motion for summary judgment. For the reasons below, Auto-Owners' motion is granted in part and denied in part.[1]

**I. FACTUAL AND PROCEDURAL BACKGROUND[2]**

This is an insurance coverage dispute arising out of a September 25, 2019, fire that destroyed the Snyders' under-construction dwelling and Auto-Owners' handling of the resulting claim. (Compl., generally, ECF No. 1-1.)  The dwelling was insured at the time of the fire under an Auto-Owners homeowners policy numbered 52-133-376-01 ("the Policy"), which was

---

[1] Under Local Rule of Civil Procedure 7.08, the court may decide motions without a hearing.

[2] The facts are more fully set forth in the court's Opinion & Order dated August 1, 2022. (Opinion & Order, ECF No. 51.)

1

effective from January 18, 2019, to January 18, 2020, and provided the following coverage:

| PROPERTY AND LIABILITY COVERAGES | LIMITS |
|---|---|
| A. Dwelling | $1,900,000 |
| B. Other Structures | 190,000 |
| C. Personal Property | 1,200,000 |
| D. Additional Living Expense and Loss of Rents | 380,000 |
| E. Personal Liability (each occurrence) | 300,000 |
| F. Medical Payments (each person) | 1,000 |

(Auto-Owners' Mem. Supp. Partial Summ. J. Ex. A. (Policy 10), ECF No. 44-1.). To date, Auto-Owners has paid a total of $2,182,818.14, consisting of $1.9 million for the dwelling under Coverage A; $154,000 for other structures under Coverage B; $35,850 for personal property under Coverage C; $49,913.74 for additional living expenses under Coverage D; and $43,054.40 for tree and debris removal under the "Additional Coverages" provision. (Id. Ex. B (Snyder Supp. Discovery Resp. 5), ECF No. 44-2.)

On May 27, 2021, the Snyders filed suit in the Oconee County Court of Common Pleas, seeking a declaratory judgment that Auto-Owners is required to pay the actual cost of replacing the home. (Compl. ¶ 45-51, ECF No. 1-1.) They also asserted claims against Auto-Owners for breach of contract, bad faith, negligent misrepresentation, equitable estoppel, and unfair methods and deceptive practices under the South Carolina Insurance Trade Practices Act ("SCITPA"). (Id. ¶¶ 52-57, 58-75, 76-78, 79-86, 87-90, ECF No. 1-1.) The Snyders further asserted negligent misrepresentation and equitable estoppel claims against Defendants Insurance Agency of the Foothills, LLC and Victor R. Holley (collectively "Foothills Defendants"). (Id. ¶¶ 79-86, 87-90, ECF No. 1-1.) On June 28, 2021, Auto-Owners removed the case based on diversity jurisdiction. (Not. Removal, ECF No. 1.)

On August 1, 2022, the court granted the Foothills Defendants' motion for summary judgment as to the Snyders' negligent misrepresentation and equitable estoppel claims. (Opinion & Order 21-22, ECF No. 51.)  The court also granted Auto-Owners' motion for partial summary judgment on the declaratory judgment issue, holding that the dwelling limit of $1.9 million is the maximum amount owed on a covered loss for a dwelling under construction and that the Snyders were not entitled to living expenses they had not incurred.  (Id. 12, 15, ECF No. 51.)  On August 26, the Snyders filed a motion to reconsider the court's August 1, 2022 order.  (Mot. Reconsideration, ECF No. 62.)  The court denied the Snyders' motion to reconsider on September 28, 2022.  (Opinion & Order, ECF No. 79.)

On August 23, 2022, the court conducted a status conference, during which the parties identified and addressed the issues remaining to be resolved.  On August 29, 2022, Auto-Owners filed the instant motion for summary judgment on the Snyders' remaining claims. (Mot. Summ. J., ECF No. 65.)  The Snyders failed to respond by the September 6, 2022 deadline and instead filed a motion for extension of time on September 7, 2022.  (Mot. Extension Time, ECF No. 72.)  The court granted the Snyders' motion for extension of time on September 8, 2022 (Text Order, ECF No. 73), and the Snyders responded to Auto-Owners motion for summary judgment on September 9, 2022.  (Mem. Opp'n Mot. Summ. J., ECF No. 75.) Auto-Owners did not file a reply, and the time to do so has passed.  This matter is ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). Although the court must "view the evidence in the light most favorable to the nonmoving party," Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017), the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

## III. DISCUSSION

To begin, although Auto-Owners moves for summary judgment on the Snyders' five remaining claims, the Snyders addressed only their bad faith and breach of contract claims in response. The Snyders do not appear to dispute that their only remaining claims are for bad faith and breach of contract with respect to the payment of additional living expenses. (See Mem. Opp'n Mot. Summ J. 1, ECF No. 75.) Accordingly, the court will grant summary judgment as to the Snyders' negligent misrepresentation, equitable estoppel, and SCITPA claims against

Auto-Owners. See Eady v. Veolia Transp. Servs., 609 F. Supp. 2d 540, 560-61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action.").

## A. Breach of Contract

The Snyders' remaining breach of contract claim concerns whether they are entitled to unpaid additional living expenses under Coverage D.[3] The court held in its August 1, 2022, order that the Snyders "are not entitled to any additional living expenses that they have not incurred"—a ruling that the Snyders do not dispute—but found an issue of fact as to whether the Snyders had actually incurred additional living expenses in the form of, for example, "duplicate property taxes and assessments." (Opinion & Order 15-16, ECF No. 51.)

In this motion, Auto-Owners asserts that, while it is "unclear" as to what particular expenses the Snyders are claiming, "any non-duplicative costs that would have been incurred by the Snyders regardless of the fire" do not qualify as additional living expenses under the Policy. (Auto-Owners' Mem Supp. Summ. J. 15, ECF No. 65.) The Snyders devote three sentences in response and merely point out the court's ruling identifying an issue of fact as to whether they

---

[3] The Policy provides that if a covered loss makes the residence uninhabitable, Auto-Owners will pay "the reasonable increase in **your** living expenses necessary to maintain **your** normal standard of living while **you** live elsewhere." (Auto-Owners' Mem. Partial Supp. Summ. J. Ex. A. (Policy 20), ECF No. 44-1) (emphasis in original). In addition, the Dwelling Under Construction endorsement provides that Coverage D is "extended" to the "location" identified "in the Declarations under 'Temporary Residence Premises Coverage,'" which in this case, is the Snyders' residence in Charlotte, North Carolina. (Id. Ex. A (Policy 10, 37), ECF No. 44-1.). The Dwelling Under Construction endorsement further states that "[t]his coverage extension includes additional living expenses incurred by **you** as a result of covered loss to the dwelling under construction caused by a peril **we** insure against, if the damage prevents you from occupying the dwelling on the scheduled date." (Id. Ex. A (Policy 37), ECF No. 44-1) (emphasis in original).

5

are entitled to duplicately-incurred living expenses. (Mem. Opp'n Mot. Summ J. 16-17, ECF No. 75.) Moreover, the parties represented to the court at the August 23, 2022, status conference that they believed they could potentially resolve the dispute regarding any unpaid additional living expenses. However, based on the record before the court, there is simply insufficient information to address the Snyders' breach of contract claim.

To this end, on September 2, 2022, the Snyders moved to continue the trial date for ninety days until January 2023, partly because the Snyders are providing end-of-life care to Mrs. Snyder's elderly mother, and partly because the court's August 1, 2022, order "has required them to adjust how they calculate[] the A.L.E." (Mot. Alter Trial Date 1-2, ECF No. 69.) Although the court is certainly sympathetic to the Snyders' situation, it should not be difficult for the Snyders, at this point in the litigation, to identify the additional living expenses they allege remain unpaid. There has been ample time for discovery,[4] and the Snyders should already have the documentation needed to "recalculate" their additional living expenses. The court also notes that the Snyders have a continuing obligation under the Federal Rules to provide Auto-Owners with this information. See Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring the disclosure of "a computation of each category of damages claimed by the disclosing party"); Fed. R. Civ. P. 26(e)(1)(A) (requiring disclosing parties to supplement prior disclosures that are "incomplete or incorrect" in a "timely manner").

---

[4] The scheduling order has been amended three times. (See Final Am. Scheduling Order, ECF No. 31.)

Accordingly, the court directs the Snyders to provide Auto-Owners and the court with an itemization of each specific additional living expense they are seeking within ten days of this order. Further, the parties are ordered to inform the court by October 20, 2022, whether any disputed issues remain regarding the breach of contract claim for the payment of additional living expenses.

### B. Bad Faith

Turning to the Snyders' bad faith claim, "[e]very contract contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 771 (D.S.C. 2006). To recover for an insurer's bad faith refusal to pay first party benefits under a contract of insurance, a plaintiff must prove:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 396-97 (S.C. 1992). "[A]n insurer acts in bad faith when there is no reasonable basis to support the insurer's decision." Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 462 (S.C. 2004). Stated differently, "[i]f there is a reasonable ground for contesting a claim, there is no bad faith." Crossley, 415 S.E.2d at 397.

Here, while the parties had a "mutually binding" insurance contract, Auto-Owners did not deny coverage. Nevertheless, the Snyders allege that Auto-Owners acted in bad faith by (1) failing to pay "undisputed amounts" owed under Coverages A and B; (2) refusing to pay

7

contractors in advance for debris removal; (3) taking too long to issue payment for the dwelling under Coverage A and living expenses under Coverage D; and (4) filing a subrogation claim without their consent and before they were made whole for their loss. (Compl. ¶¶ 61-67, ECF No. 1-1.) Each of these allegations will be addressed in turn.

### 1. Refusal To Pay "Undisputed Amounts"

The Snyders allege that Auto-Owners has "refused to pay even undisputed amounts it owes" and "has instead taken a self-serving interpretation of the Policy to the detriment of the Plaintiffs." (Id. ¶ 61, ECF No. 1-1.) More specifically, the Snyders take issue with Auto-Owners' interpretation of the Coverage A and Coverage B provisions. (Id. ¶¶ 63, 64, ECF No. 1-1.)

To begin, Auto-Owners' refusal to pay the actual replacement cost of the dwelling cannot form the basis of a bad faith claim because the court has held that "[t]he plain, unambiguous language of the Policy limits Coverage A - Dwelling to $1.9 million" and Auto-Owners has undisputedly paid that amount. (Opinion & Order 11, ECF No. 51); see Carolina Auto Remarketing Servs., LLC. v. Universal Underwriters Ins. Co., No. 2:17-cv-858-BHH, 2020 WL 5534285, at *7 (D.S.C. Sept. 15, 2020) (unpublished) ("[Plaintiff's] bad faith cause of action fails automatically because there was no refusal to pay benefits due under the contract.").

The Snyders' arguments as to Coverage B also fail. The Policy provides that, if the damage to the dwelling exceeds Coverage A's limits, Coverage B's limits ($190,000) may be used to supplement the total coverage for the dwelling, subject to a deduction for the replacement cost of any "other structures." (Auto-Owners' Mem Supp. Partial Summ. J. Ex. A. (Policy 17), ECF No. 44-1.) "Other structures" are defined as those "structures at the residence

8

premises which are not attached to the dwelling. This includes structures which are connected to the dwelling by only a utility line, fence or similar connection." (Id. Ex. A. (Policy 17), ECF No. 44-1.)

The Snyders have a dock that qualifies as an "other structure" and which was not damaged in the fire. Auto-Owners initially determined that the dock's replacement cost was $62,354.97. It therefore increased the dwelling coverage by $127.645.03. (Auto-Owners' Mem Supp. Summ. J. 4, ECF No. 65.) The Snyders later obtained a estimate from a third party, putting the replacement cost at $36,000. (Id. 4, ECF No. 65.) Based on the third-party estimate, Auto-Owners paid the Snyders an additional $26,354.97—the difference between the two values. (Id. 4, ECF No. 65.) It is unclear how Auto-Owners came up with its $62,354.97 estimate. An insurer is not necessarily insulated from bad faith liability by relying on its own investigation when making coverage decisions. See Varnadore v. Nationwide Mut. Ins. Co., 345 S.E.2d 711, 713 (S.C. 1986) (rejecting insurer's argument that it was entitled to a directed verdict on its insured's bad faith claim because it found a reasonable basis to deny the claim based on its own investigation). However, the Snyders' bad faith claim as to Auto-Owners' handling of Coverage B fails for the simple reason that, based on the undisputed facts, Auto-Owners did not refuse "to pay benefits due under [Coverage B]." Crossley, 415 S.E.2d at 396. Rather, "when presented with a new estimate from the Snyders," Auto-Owners "made adjustments to its position" and *increased* coverage in line with the Snyders' estimate. (Auto-Owners' Mem Supp. Summ. J. 9, ECF No. 65).

**2. Refusal To Pay Contractors Directly**

Next, the Snyders argue that Auto-Owners acted in bad faith by reimbursing the Snyders for the cost of debris removal instead of paying their contractor directly. (Mem. Opp'n Mot. Summ J. 11-13, ECF No. 75.) This allegation does not amount to bad faith because the Policy plainly contemplates reimbursement. The Policy reads: "**We** will pay reasonable [sic] necessary expenses **you** incur to remove debris of covered property . . . following a loss caused by a peril **we** insure against." (Auto-Owners' Mem. Supp. Partial Summ. J. Ex. A. (Policy 23), ECF No. 44-1) (emphasis in original). There cannot be bad faith where the insurer denies or, in this case, delays, the payment of benefits based on a reasonable interpretation of the insurance policy. See Helena Chem. Co., 594 S.E.2d at 462; Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co., 440 F. Supp. 3d 520, 532 (D.S.C. 2020) ("Given that coverage did not exist under the plain terms of the Coverage Extension, Auto-Owners had a reasonable basis to deny the claim.") Because the Policy contemplates that the Snyders would be paid for any expenses they incurred for debris removal, no reasonable jury could find that Auto-Owners acted in bad faith by reimbursing the Snyders instead of paying their contractor directly.

**3. Unreasonable Delays**

The Snyders further contend that "[m]aterial facts exist as to whether Auto-Owner's [sic] unreasonably delayed payment to the Snyders despite having the necessary documentation to remit payment." (Mem. Opp'n Mot. Summ J. 11, ECF No. 75.). The Snyders specifically argue that Auto-Owners acted in bad faith by unreasonably delaying payment for the loss of the dwelling under Coverage A and additional living expenses under Coverage D. (Id. 11, 13, ECF No. 75.).

"[T]he covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed." Mixson, Inc. v. Am. Loyalty Ins. Co., 562 S.E.2d 659, 662 (S.C. Ct. App. 2002). Although "no South Carolina court has specifically recognized [a] cause of action . . . for bad faith resulting only in delayed payment," the rationale for recognizing unreasonable delay as a ground for bad faith liability is clear enough.[5] Temple v. Mutual of Omaha Ins. Co., No. 4:11–cv–00128–RBH, 2013 WL 314750, at *4 (D.S.C. Jan. 28, 2013) (unpublished) (observing that "South Carolina cases discussing bad faith almost universally involve cases where an insurance company has denied coverage or payment"). Insurers are inherently susceptible to opportunism in handling claims; they retain total control over the evaluation and processing of claims to the exclusion of the insured and have the obvious incentive to avoid payment. Thus, absent the threat of tort liability, the insurer could arbitrarily delay paying undisputed amounts to coerce the often economically vulnerable insured into accepting a lower payment for those amounts that are disputed and, in so doing, face "no more penalty than interest on the amount owed." Arnold v. Nat'l Cnty. Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987). At any rate, "even assuming that delay alone can form the basis of a bad faith cause of action under South Carolina law, the crux of a bad faith case is

---

[5] Numerous courts in other jurisdictions have held that an insurer's unreasonable delay in payment may give rise to a bad faith claim. See e.g., James v. State Farm Mut. Auto Ins. Co., 743 F.3d 65, 69 (5th Cir. 2014) (collecting cases under Mississippi law); Pickett v. Lloyd's, 621 A.2d 445, 457-58 (N.J. 1993); Wilson v. 21st Century. Ins. Co., 171 P.3d 1082, 1088-89 (Cal. 2007); Best Place v. Penn Am. Ins. Co., 920 P.2d 334, 347 (Haw. 1996); Reynolds v. Am. Hardware Mut. Ins. Co., 766 P.2d 1243, 1246 (Idaho 1988); Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 340 (Tex. 1995); Ania v. Allstate Ins. Co., 161 F. Supp. 2d 424, 430 (E.D. Pa. 2001) (Pennsylvania law); Travelers Ins. Co. v. Montoya, 566 P.2d 105, 106 (N.M. Ct. App. 1977); Gregerson v. Farm Bureau Prop. & Cas. Ins. Co., 462 F. Supp. 3d 952, 963-64 (D.S.D. 2020) (South Dakota law).

still whether 'there is a reasonable ground for contesting [or delaying] a claim.'" Temple, 2013 WL 314750, at *5 (alteration in original) (quoting Crossley, 415 S.E.2d at 397). Under this standard, there is no evidence to support the inference that Auto-Owners acted unreasonably in issuing payment under Coverage A.

Insurers have a "good faith duty to investigate a claim." Flynn v. Nationwide Mut. Ins. Co., 315 S.E.2d 817, 820 (S.C. Ct. App. 1984). The fire occurred on September 25, 2019. Auto-Owners was notified of the loss the same day and completed its fire investigation on November 20. (Auto-Owners' Mem Supp. Summ. J. 3, 11, ECF No. 65.) Auto-Owners then received a structural engineering report on December 20, which concluded that the home's foundation had been compromised. (Id. 11, ECF No. 65.) On January 3, 2020, Auto-Owners issued the Snyders a check for $1,824,329.40. (Id., ECF No. 65.) Thus, fourteen days after it was determined that the foundation needed to be replaced, meaning the home was a total loss—and only one hundred days after the fire itself—Auto-Owners paid 96% of Coverage A's limit.[6] In light of the undisputed evidence that the cause of the fire was unknown, the claim involved losses exceeding $2 million, and the Snyders failed to submit a proof of loss, a three-month delay in payment is insufficient to raise a genuine issue of material fact to support a finding of bad faith. See, e.g., Cox v. Empire Fire & Marine Ins. Co., 637 F. App'x 904, 909 (6th Cir. Feb. 1, 2016) (unpublished) (affirming grant of summary judgment and holding that "the three-month delay between [the insured's] report of the fire . . . and the initial payment" was insufficient to prove bad faith); Neal v. State Farm Fire and Cas. Co., 908 F.2d 923, 926

---

[6] Auto-Owners paid the remaining $75,670.60 balance of Coverage A on July 7, 2020, after the Snyders presented a change order invoice. (Auto-Owners' Mem Supp. Summ. J. 11, ECF No. 65.)

(11th Cir. 1990) (affirming grant of summary judgment and holding that a payment delay of four months while the insurer investigated the cause of the fire did not amount to bad faith); Morrisville Pharmacy, Inc. v. Hartford Cas. Ins. Co., No. 09–CV–02868, 2010 WL 4323202, at *5 (E.D. Pa. Oct. 29, 2010) (unpublished) ("Plaintiff cites to no case law in which a court permits a claim for bad faith based upon an insurer taking five months to investigate a claim, only three of which followed the claimant's submission of proof-of-loss statements.").

It would be incongruous to require Auto-Owners to "diligently and in good faith" investigate the Snyders' claim yet find evidence of bad faith for not paying $1.9 million before the conclusion of its investigation. Royal Ins. Co. of Am. v. Reliance Ins. Co., 140 F. Supp. 2d 609, 617 (D.S.C. 2001). As the Colorado Supreme Court succinctly stated, "[an insurer] must be accorded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds not available under the contract of insurance." Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1274 (Colo. 1985); see also McCulloch v. Hartford Life & Acc. Ins. Co., 363 F. Supp. 2d 169, 178 (D. Conn. 2005) ("It is axiomatic that an insurer has the right to investigate the validity of a claim, otherwise there would be no check against fraud.").

However, as to the payment of additional living expenses under Coverage D, the court finds that there is a genuine issue of material fact as to whether Auto-Owners' delay was reasonable. On June 12, 2020, the Snyders' counsel provided Auto-Owners' counsel with a breakdown of the Snyders' 2020 first-quarter living expenses. (Mem. Opp'n Mot. Summ J. Ex. 9 (Quarterly ALE 1), ECF No. 75-9.) Hearing no response, the Snyders' counsel followed up on August 4 and 5, 2020, and asked, "Where does AO stand on paying 1st Quarter ALE[?] [I]f they dispute any of it fine, but its [sic] not zero." (Id. Ex. 16 (Quarterly ALE 1, 2), ECF

No. 75-16.)  Counsel for Auto-Owners did not reply.  On August 15, 2020, the Snyders' counsel again asked for Auto-Owners' position on the issue and, two days later, forwarded the Snyders' second-quarter living expenses.  (Id. Ex. 16 (Quarterly ALE 3, 4), ECF No. 75-16.)  Auto-Owners's counsel finally responded the same day (August 17, 2020), stating that "this is a very large complex claim" and that the Snyders' calculations of living expenses were "outside the norm."  (Id. Ex. 17 (Quarterly ALE 1), ECF No. 75-17.)  Auto-Owners' counsel added that he hoped to provide more information soon after hearing from Auto-Owners.  (Id. Ex. 17 (Quarterly ALE 1), ECF No. 75-17.)

Having received no information from Auto-Owners, the Snyders' counsel inquired yet again about the status of payment on September 2, 2020, stating in an email that "[Auto-Owners] could arrive at their [sic] own evaluation and pay it for the 1st quarter and 2nd quarter of the year.  Please explain to m[e] why nothing has been paid."  (Mem. Opp'n Mot. Summ. J. Ex. 17 (Quarterly ALE 2), ECF No. 75-17.)  After receiving no response for two months, the Snyders' counsel provided Auto-Owners with the Snyders' third-quarter living expenses on November 6, 2020.  (Id. Ex. 17 (Quarterly ALE 5), ECF No. 75-17.)  Three more months went by without a response from Auto-Owners.  On February 23, 2021, the Snyders' counsel forwarded the fourth-quarter living expenses, again highlighted Auto-Owners' lack of communication, and stated that the Snyders were planning on filing a lawsuit.  (Id. Ex. 18 (Quarterly ALE 1-2), ECF No. 75-18.)  Nine days later, on March 4, 2021, Auto-Owners finally paid the Snyders $27,675 for incurred HOA dues and storage expenses.  (Id. Ex. 17 (Quarterly ALE 3), ECF No. 75-17.)

Based on this timeline and the parties' correspondence, the court finds that there are genuine issues of material fact as to whether Auto-Owners acted in bad faith in handling the Snyders' claim for additional living expenses under Coverage D.  There is evidence that Auto-Owners knew for several months that the amount of living expenses it owed was more than zero and that it failed to pay any additional living expenses or offer an explanation for what expenses it disputed.  Thus, a genuine issue of material fact remains as to whether Auto-Owners had an "objectively reasonable basis" for its delay and lack of communication.  State Farm Fire & Casualty Co. v. Barton, 897 F.2d 729, 731 (4th Cir. 1990).  Accordingly, Auto-Owners is not entitled to summary judgment on the Snyders' bad faith claim stemming from its delay in paying additional living expenses under Coverage D.

### 4. Filing a Subrogation Action Without Notice

Finally, the Snyders argue that Auto-Owners acted in bad faith by prematurely filing a subrogation action without their consent against the contractor that allegedly caused the fire. (Mem. Opp'n Mot. Summ J. 14, ECF No. 75.)  This argument fails because the Snyders have failed to set forth any consequential damages flowing from Auto-Owners' pursuit of the subrogation action.

"Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against [a] defendant." Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages, Equity, Restitution, 411 (3d ed. 2018).  Subrogation may arise from contract or equity.  Shumpert v. Time Ins. Co., 496 S.E.2d 653, 656 (S.C. Ct. App. 1998) (citing Dailey v. Secura Ins. Co., 476 N.W.2d 299, 300 (Wis. Ct. App. 1991)).

> Legal subrogation is not dependent upon contract. The doctrine is an equitable one, founded not upon any fixed law, but upon principles of natural justice; its purpose is to require the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it; and it is to be applied according to the dictates of equity and good conscience in the light of the actions and relationship of the parties.

Calvert Fire Ins. Co. v. James, 114 S.E.2d 832, 834 (S.C. 1960). Under principles of equitable subrogation, an insurer "may not bring action against the tort-feasor where it has paid only a portion of the loss sustained by the insured, because the insured's right of action is single and indivisible." Id. at 835. "Conventional subrogation," on the other hand, "arises by contract and is specifically bargained for by the parties." Shumpert, 496 S.E.2d at 611.

The Policy has a subrogation provision. It provides: "After making payment under this policy, **we** will have the right to recover to the extent of **our** payment from anyone held responsible." (Auto-Owners' Mem. Supp. Partial Summ. J. Ex. A. (Policy 36), ECF No. 44-1) (emphasis in original). Thus, under the Policy's plain language, Auto-Owners' right to subrogation did not accrue until it paid the Snyders for their loss. However, five days before it paid the Snyders $1,824,329.40 under Coverage A, Auto-Owners filed a subrogation action against the contractor allegedly responsible for the fire. (Mem. Opp'n Mot. Summ J. 14, ECF No. 75.) Though the precise relationship between subrogation and bad faith is not entirely clear, the court need not decide the significance of Auto-Owners' premature filing of the subrogation action because the Snyders cannot show any damages to support this claim of bad faith. See Harriman v. Assoc. Indus. Ins. Co., No. 2:18-cv-2750-DCN, 2022 WL 816123, at *10 (D.S.C. Mar. 17, 2022) (unpublished) ("Harriman failed to assert any damages that flow from the failure to provider [sic] her benefits she was purportedly owed as set out by contract. On this

16

basis, the court grants summary judgment in Associated Industries' favor."), appeals filed, No. 22-154 (4th Cir. May 13, 2022), No. 22-1694 (4th Cir. June 28, 2022).

"Damages are a critical element of a first-party insurance bad faith action." Jordan v. Allstate Ins. Co., No. 4:14-cv-03007-RBH, 2016 WL 4367080, at *9 (D.S.C. Aug. 16, 2016) (unpublished). An insured may "recover consequential damages in a tort action" if he "demonstrates bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract." Nichols v. State Farm Mut. Auto. Ins. Co., 306 S.E.2d 616, 619 (S.C. 1983). For instance, in Tadlock Painting Co. v. Maryland Casualty Co., Tadlock, the insured, was painting at an industrial job site owned by Cargill when wind carried spray paint onto the vehicles of Cargill's employees. 473 S.E.2d 52, 53 (S.C. 1996). Tadlock notified its insurer of Cargill's claims, and a dispute soon arose over the application of the deductible, which delayed payment and the cleaning of the employees' vehicles. Id. Because of this delay, Cargill refused to consider Tadlock for any of its future painting projects. Id. The South Carolina Supreme Court held that Tadlock was permitted to recover these lost profits as consequential damages arising from its insurer's failure to timely handle the third-party claims. Id. at 55.

The Snyders, unlike Tadlock, have failed to identify any consequential damages flowing from Auto-Owners' alleged bad faith related to the filing of the subrogation action. When asked to specify exactly how the Snyders have been injured by the filing of the subrogation action, Mr. Snyder responded, "I don't know that I've been damaged. I guess I feel like I've – I've been potentially damaged." (Auto-Owners' Mem. Opp'n Pls. Mot. Partial Summ. J. Ex. A (Charles Snyder Dep. 49), ECF No. 49-1.) Based on the record before the court, Auto-Owners' pursuit of

the subrogation action has not interfered in any way with the Snyders' "rights to receive benefits under the contract." Nichols, 306 S.E.2d at 618. Indeed, the Snyders have received $2,182,818.14 under the Policy to date and could recover more from the alleged tortfeasor having intervened in the state court action. To this end, there is no indication that the Snyders and Auto-Owners are competing for a "limited pool of money" due to the alleged tortfeasor's insolvency or limited insurance coverage. Paulson v. Allstate Ins. Co., 665 N.W.2d 744, 750 (Wis. 2003); see also Julson v. Federated Mut. Ins. Co., 562 N.W.2d 117, 120 (S.D. 1997) (finding no bad faith where the insurer exercised its right to subrogation before the insured was made whole because "the pool of funds awarded from the third-party tort-feasors was not shown to be inadequate to make all parties whole").

Finally, in a single-sentence argument, the Snyders contend that the attorney's fees they have incurred in intervening in the subrogation action constitute consequential damages. (Mem. Opp'n Mot. Summ J. 16, ECF No. 75.) South Carolina adheres to the general rule that attorney's fees are not recoverable unless authorized by contract or statute. Duke Power Co. v. S.C. Pub. Serv. Comm'n, 326 S.E.2d 395, 406 (S.C. 1985). Morever, "[c]ourts applying South Carolina bad faith law have not awarded attorney's fees as consequential damages in tort actions." Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Nos. 12-2256, 12-2350, 2014 WL 504086, at *11 (4th Cir. Feb. 10, 2014) (unpublished) (rejecting argument that South Carolina implicitly follows California's approach allowing insureds to recover attorney's fees incurred to compel payment under an insurance policy); Andrews v. Central Surety Ins. Co., 271 F. Supp. 814, 821 (D.S.C. 1967). The South Carolina Court of Appeals has even refused to adopt a "bad faith exception" to the American Rule where a minority partner was forced to bring suit for

dissolution and accounting after he was wrongfully denied access to the partnership's records and files.  Weeks v. McMillan, 353 S.E.2d 289, 292-94 (S.C. Ct. App. 1987).  Thus, the court finds that attorney's fees are not recoverable as consequential damages in this scenario under South Carolina law.

### IV. CONCLUSION

To summarize, the Snyders' breach of contract claim for additional living expenses remains pending, and the court directs the Snyders to provide Auto-Owners and the court with the specific amount of the remaining additional living expenses they allege that they are owed within ten days.  Further, the parties are ordered to inform the court by October 20, 2022, whether there are any remaining issues with respect to the breach of contract claim for the payment of additional living expenses.  Moreover, the court grants summary judgment on the Snyders' negligent misrepresentation, equitable estoppel, and SCITPA claims.  As to the bad faith claim, the court grants Auto-Owners' motion for summary judgment on the Snyders' arguments that Auto-Owners acted in bad faith by failing to pay "undisputed amounts" owed under Coverages A and B, refusing to pay contractors directly, taking too long to issue payment under Coverage A, and filing a subrogation action without their consent.  However, the court denies Auto-Owners' motion for summary judgment with respect to the Snyders' bad faith claim related to the unreasonable delay in payment of additional living expenses under Coverage D.

It is therefore

**ORDERED** that Auto-Owners' motion for summary judgment, docket number 65, is granted in part and denied in part. It is further

**ORDERED** that the Snyders shall provide Auto-Owners and the court with an itemization of each additional living expense they are seeking, along with the specific amount claimed, within ten (10) days of this order. It is further

**ORDERED** that the parties shall inform the court by October 20, 2022, whether any issues remain with respect to the payment of additional living expenses.

**IT IS SO ORDERED.**

                                        s/Henry M. Herlong, Jr.
                                        Senior United States District Judge

Greenville, South Carolina
October 5, 2022